## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **POST ACUTE MEDICAL, LLC,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **V.** | § | |
| | § | **Civil Action No.** |
| **CHRISTOPHER LEBLANC AND** | § | _____ |
| **MERIDIAN HOSPITAL** | § | |
| **SYSTEMS CORPORATION** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **DEFENDANTS.** | § | |
| | § | |
| | § | |
| | § | |

## POST ACUTE MEDICAL, LLC'S VERIFIED COMPLAINT

Post Acute Medical, LLC ("PAM") files this Verified Complaint, which will be followed with an Application for Temporary Restraining Order and Request for Preliminary Injunction against Defendants Christopher LeBlanc ("LeBlanc") and Meridian Hospital Systems ("Meridian") (collectively "Defendants"). In support of its Verified Complaint, PAM makes the following averments based on current knowledge, information, and reasonable belief.

## I.
## PRELIMINARY STATEMENT

Until recently, PAM had authorized Meridian and LeBlanc to access PAM's confidential patient data and business information ("Highly Confidential Data") in

connection with PAM's daily operations, because Meridian set up a computerized

database through certain software applications, to essentially house and aggregate

PAM's data.   Importantly, this Highly Confidential Data included Protected Health

Information ("PHI") and Electronic Protected Health Information ("EPHI") related

to patients in PAM's network affiliated hospitals throughout the country, as well as

valuable customer and vendor contact lists and preference information, which PAM

does not disclose to the public.   As part of their key contractual obligations and in

accordance with healthcare regulatory requirements to PAM, LeBlanc and Meridian

understood and agreed they had no authorization to use PAM's Highly Confidential

Data for any reason other than supporting PAM's operations and further agreed to

return such Highly Confidential Data upon terminating the contractual relationship

pursuant to the Health Insurance Portability and Accountability Act ("HIPAA").   To

ensure the confidentiality of such sensitive information was safeguarded as required

by HIPAA and other statutory and regulatory requirements, LeBlanc and Meridian

agreed to take mandatory measures to comply with the business associate

requirements of HIPAA relating to safeguarding and returning patient information.

This agreement was a threshold requirement for PAM to do business with LeBlanc

and Meridian.   On or around June of 2018, the operative version of the Business

Associate Addendum ("BAA") was executed between the Parties,[1] which expressly

---

[1] The term "Parties" refers to PAM, Meridian and LeBlanc.

limited both LeBlanc and Meridian's use and disclosure of patient PHI and EPHI to matters necessary for the performance of Meridian's services for PAM.

Throughout the entirety of the relationship, PAM repeatedly reported several frustrations to LeBlanc about the effectiveness of Meridian's software applications, which ultimately led PAM to the realization that it would be better for PAM's operations to develop its own applications tailored to its specific and evolving needs. For years prior to those discussions, PAM had provided LeBlanc and Meridian with extensive feedback and resources to develop new applications and improve existing applications.  In 2018, when it became apparent that PAM might no longer be a captive audience for Meridian, LeBlanc discussed the possibility of providing PAM an equity interest in Meridian if PAM would stay with Meridian and enter into a long-term contract.  PAM and LeBlanc explored this proposal, but negotiations ultimately fell through.

When the negotiations for PAM to acquire an equity interest in Meridian fell through, instead of adhering to their contractual obligations as a responsible business associate, complying with the law, and promptly returning PAM's Highly Confidential Data, LeBlanc, through Meridian: (1) falsely accused PAM of misappropriating its software applications; (2) abruptly terminated PAM's access to Meridian's applications *and* PAM's own Highly Confidential Data; (3) repeatedly refused to return PAM's Highly Confidential Data; (4) accessed and mined PAM's

Highly Confidential Data without authorization after receiving multiple demands from PAM to immediately return such data; and (5) last Wednesday, publicly disclosed PHI of a patient, which was contained in PAM's Highly Confidential Data that Meridian was not authorized to access and has been holding hostage since May of 2019.

Although LeBlanc and Meridian received more than a half-dozen requests from PAM to immediately return PAM's Highly Confidential Data, rather than return any such data as required by law, LeBlanc and Meridian have held the data ransom and repeatedly threatened to destroy it in violation of HIPAA. The filing of this lawsuit and the expedited injunctive relief sought herein has now become necessary based upon Meridian and LeBlanc's continued withholding of PAM's Highly Confidential Data, their unauthorized access to and open and obvious use of PAM's Highly Confidential Data through Meridian in violation of LeBlanc and Meridian's contractual obligations and strict statutory requirements, and LeBlanc's threats to destroy patient data that PAM is required to maintain. PAM has diligently attempted to secure the return of its Highly Confidential Data from LeBlanc and Meridian, but they have willfully refused. In doing so, LeBlanc has compromised the security of PAM's Highly Confidential Data by accessing, mining and using such data without authorization and with Meridian, LeBlanc has deprived PAM of access to other Highly Confidential Data needed for follow-up patient care and PAM's

operations resulting in imminent and irreparable harm to PAM.  This malicious misconduct leaves PAM with no other choice but to seek expedited judicial intervention.

## II.
## THE PARTIES

1.      PAM is a limited liability company organized and existing under the laws of the State of Delaware and with its principal place of business in the Commonwealth of Pennsylvania.  PAM's headquarters are located at 1828 Good Hope Road, Suite 102, Enola, Pennsylvania 17025.

2.      Meridian is a corporation organized and existing under the laws of the State of Texas, with its principal office in Dallas, Texas, and doing business in the Commonwealth of Pennsylvania.

3.      Christopher LeBlanc ("LeBlanc") is a Texas resident who, upon information and belief, resides at 4016 Southwestern Blvd., Dallas Texas 75225.

4.      LeBlanc is the majority owner of Meridian.  In connection with his business relationship with PAM, LeBlanc has made multiple trips to PAM headquarters in Pennsylvania while conducting business with PAM.

## III.
## JURISDICTION AND VENUE

5.      This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332, as diversity of citizenship exists and the amount in controversy exceeds $75,000.00.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this civil action—including the execution of the contract governing this dispute—occurred in this district.

7.      LeBlanc and Meridian have also profited from the receipt of payments made from Pennsylvania by PAM to Meridian.

## IV.
## FACTUAL BACKGROUND

**A.      PAM and Meridian Initiate a Business Relationship**

8.      PAM is a healthcare provider that owns and operates long-term acute care hospitals and inpatient and outpatient rehabilitation hospitals and facilities throughout the country.

9.      In connection with providing high quality patient care, PAM maintains confidential patient data necessary for patient treatment, discharge and follow-up care.  PAM also utilizes critical business data to facilitate PAM's day-to-day healthcare operations.

10.    In 2013, David LeBlanc ("LeBlanc Senior"), a longtime acquaintance of the CEO of PAM, approached PAM about considering the possibility of PAM agreeing to do business with Meridian Healthcare Intelligence, which later evolved into Meridian Hospital Systems Corporation, a company owned and operated by his son, Chris LeBlanc.

11.    At the time LeBlanc Senior approached PAM, Meridian was featuring a software application called Pinpoint, which Meridian marketed as a user-friendly hospital reporting system that was capable of interfacing with financial operating systems of healthcare providers.

12.    Meridian's application operated by extracting patient data to create real time financial and clinical reports, which required access to healthcare provider patient data and corresponding business information.

13.    Although Meridian was a young company, as a favor to LeBlanc Senior, in February of 2013, PAM agreed to give Meridian an opportunity to support PAM's operations with Meridian's Pinpoint software.

14.    In connection with that opportunity, LeBlanc represented to PAM that the Pinpoint application would enable PAM's hospital administrators to compare physician performance, identify wasteful spending, track costs and review detailed financial performance metrics that could enhance efficiency and improve operations.

15.     LeBlanc also maintained that Meridian's application could help PAM improve cost management and operation performance by identifying best practices and providing automated capabilities to assist with efficiently managing patient treatment and care coordination.

**B.**     **Meridian Promises to Safeguard and Returns PAM's Highly Confidential Data**

16.     Based on LeBlanc's representations, PAM expressed a willingness to use the Pinpoint application provided LeBlanc and Meridian agreed to adhere to the requisite HIPAA requirements of a business associate, which is both required by law and which they readily accepted.  In reliance on this legal assurance, PAM entered into an agreement with Meridian and started doing business with LeBlanc and Meridian in February of 2013.

17.     In connection with the use of Pinpoint and in reliance on LeBlanc and Meridian's agreement to safeguard PAM's Highly Confidential Data, PAM provided Meridian and LeBlanc with access to patient data and other sensitive business information.

18.     Importantly, but for Meridian and LeBlanc's agreement to maintain such information as confidential and only use or disclose it to support PAM's operations, PAM would not have provided LeBlanc or Meridian with access to such information.

19.    PAM also made clear that all of PAM's patient data and business information belonged solely to PAM and not to Meridian or LeBlanc, which both Meridian and LeBlanc understood and agreed.

20.    The Parties further agreed that LeBlanc and Meridian would be required to return PAM's Highly Confidential Data to PAM upon request or termination of the relationship, which was another material condition for PAM to do business with Meridian.

21.    Indeed, the contractual requirement for Meridian to return PAM's Highly Confidential Data was especially critical because it included in significant part PHI and EPHI protected by HIPAA.

22.    Based on LeBlanc and Meridian's assurances and corresponding obligations, PAM expected Meridian to cease accessing and immediately return any and all of its Highly Confidential Data upon request.

23.    Had PAM known that Meridian would refuse to comply with the most basic of HIPAA obligations, PAM would not have engaged in or continued to do business with LeBlanc or Meridian.

## C.    **PAM Helps Meridian Enhance Its Business**

24.    Early in the relationship, it became apparent to PAM that LeBlanc and Meridian did not have much experience supporting healthcare providers who

specialize in post-acute treatment, particularly inpatient and outpatient rehabilitation.

25.    PAM noticed that as a result of LeBlanc and Meridian's inexperience, there were deficiencies in the Pinpoint application that needed to be improved for the application to meaningfully support PAM's operations.

26.    Over the course of the next several years, PAM provided extensive feedback, ideas, resources and support to Meridian to create more tailored applications for healthcare providers who offered post-acute medical treatment to patients.

27.    The feedback, ideas and support were invaluable to Meridian and allowed Meridian to grow its business, enhance its existing applications and create new applications, from which Meridian made a significant amount of revenue.

28.    In fact, while PAM was a customer, and in connection with the feedback and support it provided, Meridian created a discharge calendar that tracked the discharge of patients, a MedNarrative application that allowed providers to track follow-up notes after patients were discharged, and a Q1 application that collected customer and vendor contact information and preferences.

29.    Further, in connection with the extensive feedback and support provided by PAM, including identifying bugs, fixing errors in calculations and

assisting in making the software functional, Meridian was able to enhance its Pinpoint application and subsequently release Pinpoint 2.0.

30.    Meridian in turn marketed these applications to prospective customers and hosted demos where Meridian would showcase all the features and look of the interfaces for these applications to prospective customers who were not required to sign a nondisclosure agreement or confidentiality agreement to see the demos.

31.    Upon information and belief, during PAM's business relationship with Meridian, PAM was Meridian's largest customer.

32.    PAM also provided Meridian with credibility in the post-acute medical world from which Meridian financially benefited.

**D.    Meridian Receives Highly Confidential Data From PAM**

33.    During PAM's relationship with Meridian, PAM provided Meridian with access to Highly Confidential Data for PAM's use in connection with the following applications: (1) Pinpoint; (2) MedNarrative; (3) Discharge Calendar; and (4) Q1.

34.    PAM ultimately used these applications to house and sort PAM's aggregated data and run reports based on the data.

35.    Significantly, this data included PHI of PAM's patients and valuable customer and vendor information that PAM does not disclose to the public.

36.    Meridian not only agreed to adhere to the mandatory terms and conditions required by the HIPAA Privacy and Security Rules as well as the HITECH[2] Act, but also agreed to refrain from using or disclosing PAM's Highly Confidential Data in any manner inconsistent with PAM's obligations under HIPAA.

37.    More specifically, LeBlanc and Meridian assured PAM that they would implement and maintain administrative, physical, and technical safeguards that would reasonably and appropriately protect the confidentiality, integrity, and availability of PHI and EPHI that Meridian creates, receives, maintains or transmits on behalf of PAM, and ensure that PHI and EPHI are not used or disclosed by Meridian in violation of its HIPAA-related obligations owed to PAM.

38.    PAM relied on this representation in continuing to do business with Meridian and providing Meridian and LeBlanc with access to PAM's Highly Confidential Data, just as it does with all of its vendors or subcontracts who receive patient data subject to HIPAA protections.

39.    Critically, Meridian was also required to provide PAM with access to PAM's Highly Confidential Data housed in Meridian's applications and ensure that none of PAM's data was comingled with the data of Meridian's other customers and that PAM was never deprived of access to PAM's Highly Confidential Data, which

---

[2] The term "HITECH" refers to the Health Information Technology for Economic and Clinical Health Act.

was critical to the treatment of PAM's patients and running PAM's healthcare operations efficiently.

**E.**    **PAM Becomes Frustrated with Meridian's Applications**

40.    Throughout the course of PAM's business relationship with Meridian, PAM discovered countless bugs, deficiencies and/or complications with Meridian's applications that interfered with PAM's use of the applications and the results LeBlanc and Meridian represented PAM would achieve by using the applications.

41.    Because PAM was spending hundreds of thousands of dollars to use Meridian applications annually, sometime prior to or early in 2018, PAM recognized that it would be more beneficial for PAM's long-term business interests and patient care coordination goals to reallocate these funds toward the development of a customized application tailored to PAM's operations and evolving needs.

42.    In fairness to Meridian, in 2018, PAM discussed its frustrations with LeBlanc and disclosed that it was considering the development of its own application.

43.    LeBlanc thus had transparency into PAM's perspective on why developing its own application made business sense for PAM.

44.    With the then-existing agreement between PAM and Meridian about to expire, PAM expressed hesitation about renewing its then agreement with Meridian.

45.     Recognizing the significance of the contribution PAM made to Meridian's business and the impact that PAM's departure would have on Meridian's revenues, LeBlanc expressed a willingness to consider providing PAM an equity interest in Meridian in exchange for PAM agreeing to a long-term contract with Meridian.

46.     At the time, however, it was determined that there was insufficient time to develop its own application, and as a result, PAM and Meridian entered into a one-year extension of their relationship.

47.     LeBlanc and Meridian were well-aware at the time that PAM was not satisfied with the existing relationship, as evidenced by the single-year extension.

**F.     Meridian and LeBlanc Execute the Business Associate Addendum**

48.     In connection with this one-year extension, which expired in June of 2019, LeBlanc and Meridian were required to, among other things, reaffirm their obligations to comply with HIPAA and continue safeguarding PAM's Confidential Data.

49.     To memorialize these critical obligations, in June of 2018 the Parties entered into the Business Associate Addendum ("BAA"), which governs and limits Meridian's access, use, and disclose of PHI and EPHI received from PAM in connection with services provided by Meridian to PAM.[3]

---

[3] A true and correct copy of the BAA is attached as Exhibit "1".

50.     LeBlanc personally executed the BAA, which bound him individually and Meridian to the contractual obligations contained therein.

51.     Specifically the BAA made clear that Meridian and LeBlanc could only disclose and use PHI and EPHI received from PAM "only if and to the extent directly related to, and necessary for, the performance of the Services for or on behalf of [PAM]."[4]

52.     The BAA further states that Meridian shall not use or disclose any PHI or EPHI in any manner inconsistent with PAM's obligations under HIPAA or "that would violate HIPAA Privacy or Security Rules."[5]

53.     Noticeably absent from the BAA is any provision permitting LeBlanc or Meridian to use PHI or EPHI for their own pecuniary gain because such use was undoubtedly precluded by the BAA.

54.     In this regard, Meridian and LeBlanc were specifically obligated to "establish procedures for mitigating, to the greatest extent possible, any deleterious effects arising from any improper use and/or disclosure of PHI and EPHI, and shall implement all such procedures and all other reasonable mitigation steps requested by PAM."

---

[4] *Id*. at III(B).
[5] *Id*. at III(D).

55.   Additionally, prior to disclosing an PHI and EPHI to any subcontractor, agent, or other representative that is authorized to create, receive, maintain, or transmit PHI and EPHI on behalf of Meridian, LeBlanc and Meridian were required to ensure that such person agree, in writing, to adhere to the same restrictions and conditions on the use and/or disclosure of PHI and EPHI that apply to Meridian under the BAA.[6]

56.   Significantly, Meridian's obligations under the BAA survive the termination of the business relationship between the Parties.

57.   In particular, the BAA is clear that termination shall not relieve LeBlanc or Meridian of their duties concerning previously received PHI or EPHI, as mandated by law.[7]

58.   The BAA further mandates that upon termination of the relationship, Meridian and LeBlanc are obligated to recover any PHI and EPHI in the possession of its subcontractors, agents or representatives and return such information to PAM, unless PAM agrees otherwise.[8]

59.   Because of the significant sensitivity of PAM's Highly Confidential Data and the critical importance of safeguarding it, the parties agreed under the BAA that disclosure of PHI "shall give rise to irreparable injury to [PAM] . . ." and that

---

[6] *Id.* at VI.
[7] *Id.* at IX(C).
[8] *Id.*

PAM "shall be entitled to equitable relief, including an injunction and specific performance, in the event of any breach or threatened breach of the agreement by [Meridian]."[9]

60.    The Business Associate is obligated to take action with regard to the return of data under the BAA by contacting PAM and identifying the manner of returning the data and identifying specifics that would justify any deviation from that expectation.

61.    It is clear, to date, that neither LeBlanc nor Meridian has taken any of the required actions identified in the BAA.

62.    Each of the foregoing obligations under the BAA are imposed on LeBlanc and Meridian and remain ongoing, particularly since Meridian and LeBlanc are currently holding PAM's Highly Confidential Data hostage without authorization.

### G.    PAM Terminates its Business Relationship with Meridian

63.    As the one-year extension neared its expiration, PAM decided not to renew its agreement with Meridian.

64.    Accordingly, on February 28, 2019, PAM provided Meridian with a timely notice of nonrenewal notifying Meridian that PAM would not be renewing

---

[9] *Id*. at XI(A).

its underlying agreement with Meridian, which would expire by its own terms on June 12, 2019.

65.     Importantly, in that notice PAM made clear that before June 12, 2019, all of PAM's data in Meridian's Pinpoint, Q1 and MedNarrative applications needed to be returned to PAM, including but not limited to marketing information and patient data.

66.     Notwithstanding this notice, none of PAM's Highly Confidential Data has been returned by Meridian.

67.     After receiving PAM's nonrenewal notice, LeBlanc knew that he and Meridian were on the verge of losing PAM's business and the associated revenue PAM generously paid Meridian year after year.

68.     Accordingly, immediately after receiving notice that the agreement with PAM would end, LeBlanc devised a plan in which he agreed to give PAM a 44% equity interest in Meridian for no money in exchange for a long-term contract with PAM.

69.     LeBlanc's goal was simple – try and lure PAM into negotiations, make PAM believe he intended to move forward with a deal, slow play the negotiations, and try to run out the clock again in hopes of forcing PAM into executing another extension.

70.     While PAM entertained LeBlanc's proposal in March of 2019 and thought a tentative deal had been reached, it soon became clear to PAM that LeBlanc was negotiating in bad faith and did not intend to honor the deal.

71.     As a result, PAM ended negotiations in late March of 2019 and turned its attention to winding up the relationship with Meridian and securing the return of its Highly Confidential Data.

## H.     Meridian Improperly Uses Litigation as a Weapon to Extort Money from PAM

72.     Realizing that PAM had not fallen prey to LeBlanc's calculated delay efforts, LeBlanc and Meridian desperately resorted to more aggressive tactics by manufacturing an excuse to file a groundless lawsuit suit and application for temporary restraining order ("TRO") against PAM in Houston, Texas ("Texas Lawsuit").

73.     Neither PAM, Meridian nor LeBlanc are located in Houston, Texas and none of the facts giving rise to the Texas Lawsuit arose in Houston, Texas.

74.     The only connection to Houston, Texas is that LeBlanc's sister-in-law, Caroline Adams, who is his counsel in the Texas Lawsuit, resides and practices in Houston, Texas, and Ms. Adams' partner, Anthony Buzbee, who is also listed as counsel on the pleadings in the Texas Lawsuit, is currently running for mayor of Houston and likewise resides in Houston, Texas.

75.     In order to file suit in Houston, Texas and have a chance of making it stick, LeBlanc was informed and/or understood that he needed to sue a local PAM hospital or local entity related to PAM, with a Harris County address, to justify his decision to file the Texas Lawsuit in Harris County.

76.     Assuming that his nefarious plan would work and that Meridian would obtain an overreaching temporary restraining order from the sitting ancillary judge in Harris County that would force PAM to pay a monthly royalty rate to Meridian and be restrained from accessing Meridian's applications, which contained PAM's Highly Confidential Data, LeBlanc approved suing two PAM entities with Harris County addresses solely because of their association with PAM.

77.     More specifically, on April 3, 2019, LeBlanc through Meridian filed a lawsuit and application for TRO and Temporary Injunction in Harris County naming Pam Physician Enterprise and Clear Lake Institute for Rehabilitation, LLC as Defendants to the lawsuit.

78.     Significantly, these entities were added as Defendants to the Texas Lawsuit even though LeBlanc could not identify any acts or omissions by either entity that gave rise to the meritless allegations asserted against them or the facts at issue in the Texas Lawsuit.

79.     In fact, LeBlanc could not even name one person who actually worked for either entity that he or anyone else from Meridian ever interacted with or why

these entities were sued other than that they were affiliated with PAM and located in Harris County.

80.     In short, it appears that the sole purpose of suing these two entities in the Texas Lawsuit was to manufacture a basis for jurisdiction and venue in Harris County where LeBlanc and Meridian had secured legal services without having to pay hourly legal fees to his sister-in-law, Caroline Adams.

81.     In response, on April 9, 2019, PAM and the other two entities affiliated with PAM, who were wrongfully sued in the Texas Lawsuit (the "Texas PAM Defendants"), filed a Motion to Dismiss all of Meridian's claims under the Texas Citizens Participation Act ("TCPA") due to Meridian's intentional interference with their right of association.  That Motion has since been fully briefed, argued at oral hearing and is now awaiting final adjudication by the Honorable Judge Kristen Hawkins in the Texas Lawsuit.

82.     On April 29, 2019, the Texas PAM Defendants filed their Original Answer, General Denial, Affirmative Defenses and Special Exceptions Subject to their TCPA Motion to Dismiss.

**I.     Meridian Shuts down PAM's Access to Meridian's Applications, Deprives PAM of Access to its Data and Threatens to Destroy PAM's Highly Confidential Data**

83.     The then sitting ancillary judge in Harris County, the Honorable Judge Daryl M. Moore, who presided over Meridian's original TRO application on April

21

3, 2019, refused to enjoin PAM from accessing its Highly Confidential Data in Meridian's applications, particularly since PAM was still paying for that service, and also refused to order PAM to pay Meridian a monthly royalty.

84.    On May 8, 2019, LeBlanc took matters into his own hands, however: Despite Judge Moore's prior ruling and the judicial guidance he provided, on May 8, 2019, without any notice, Meridian unilaterally shut down access to its applications with respect to all users affiliated with PAM and their hospitals nationwide, thereby depriving all such users from accessing PAM's Highly Confidential Data in Meridian's applications.

85.    In shutting down access as it did, Meridian triggered mass disruption to the operations of PAM and its affiliate hospitals and further interfered with their ability to, among other things, to timely follow-up with discharged patients to provide further patient care, access PAM's patient data in Meridian and PAM's customer lists, vendors lists and corresponding contact and preference information.

86.    Following Meridian's abrupt and malicious termination of PAM's access to Meridian's applications, PAM immediately demanded that Meridian restore access to the applications, for which PAM had paid.[10]

---

[10] A true and correct copy of counsel for PAM in the Texas Lawsuit, Michelle Pector's, May 8, 2019 8:51 a.m. email to Caroline Adams, counsel for Meridian, is attached hereto as Exhibit "2".

87.   Later that same afternoon at 4:31 p.m., PAM sent a formal letter again demanding Meridian restore access and immediately return PAM's data stored in Meridian's applications, including its confidential customer lists and vendor lists, which one of Meridian's owners, Elizabeth Markert, confirmed are PAM's trade secrets, and PAM's patient data.[11]

88.   In that letter, PAM also made clear that Meridian was required to immediately return, without retaining copies, all of PAM's data and patient data and that Meridian's prior license to use, display, copy or retain such data was rendered void.[12]

89.   In response, Meridian informed PAM of its contention that it was under no obligation to return PAM's data and, shockingly, that it has the right to destroy such data without returning it to PAM, despite the fact that PAM has a legal obligation to maintain patient information, and destroying such information would include PHI, EPHI and certain data of which PAM had informed Meridian it does not have copies.[13]

90.   Destroying PAM's data would thus constitute destruction of PAM's property that would adversely impact, among other things, PAM's operations, patient records, legal obligations, follow-up care, and reputation, which

---

[11] A true and correct copy of Mrs. Pector's May 8, 2019 letter to LeBlanc and Meridian is attached hereto as Exhibit "3".
[12] Id.
[13] A true and correct copy of the May 20, 2019 response letter is attached as Exhibit "4".

unquestionably relate to patientcare within the State of Pennsylvania and throughout the United States.

91.     On May 15, 2019, PAM, through its counsel, sent a second demand to Meridian and LeBlanc for the immediate return of PAM's data and money that PAM had paid in exchange for Meridian's services during May, informing Meridian that failure to do so would leave PAM with no choice, but to exercise its available legal remedies to address these serious violations.

92.     Because Meridian and LeBlanc did not return any of PAM's data or funds, on May 16, 2019, counsel for PAM emailed counsel for Meridian again inquiring about when PAM's data and funds would be returned.[14]

93.     Once again, LeBlanc and Meridian refused to comply and continued to threaten destruction of PAM's data, including PAM's Highly Confidential Data.

94.     On May 24, 2019, PAM sent LeBlanc and Meridian another demand letter reiterating that neither LeBlanc nor Meridian "have any existing right to retain or use PAM's money, data, or confidential information nor interfere with PAM's business."[15]

---

[14] A true and correct copy of Mrs. Pector's May 16, 2019 email to Caroline Adams is attached as Exhibit "5".
[15] A true and correct copy of Mrs. Pector's May 24, 2019 letter on behalf of PAM to LeBlanc and Meridian is attached hereto as Exhibit "6".

95.     Despite PAM's efforts, Meridian and LeBlanc refused to return any of PAM's data, including PAM's Highly Confidential Data, and instead decided to hold PAM's data hostage.

96.     On May 30, 2019, Meridian notified PAM in writing of its intention and threat to destroy all of PAM's PHI and EPHI on May 30, 2019 and issued PAM an $8,500.00 invoice demanding payment of funds before Meridian would return any data from Q1 or Pinpoint to PAM.[16]

97.     In effect, Meridian requested money in exchange for patient data that PAM had originally transferred to Meridian for safekeeping in accordance with the BAA.  This can be viewed as nothing short of extortion.

98.     When asked about the basis and calculation for this fabricated invoice, LeBlanc was wholly unable to provide any justification for how he arrived at the $8,500 charge for the return of PAM's data.[17]  Instead, it appears to be nothing more than a ransom demand.

99.     Thereafter, LeBlanc willfully continued to use PAM's data as a bargaining chip to extort money from PAM in violation of the law and LeBlanc and Meridian's contractual obligations to PAM in the BAA and otherwise.

---

[16] A true and correct copy of Ms. Adam's May 30, 2019 letter to Mrs. Pector is attached as Exhibit "7".

[17] A true and correct copy of the relevant excerpt from the June 5, 2019 deposition of Chris LeBlanc is attached as Exhibit "8".  *See id.* at 40:17-41:3.

100.    Importantly, PAM's data could have been easily been exported electronically to PAM on the very day it was requested.

101.    On June 5, 2019, LeBlanc was verbally asked in person by counsel for PAM to promptly return PAM's data, but once again LeBlanc ignored PAM's demand and continued to deprive PAM from access to PAM's Highly Confidential Data.[18]

102.    On June 10, 2019, counsel for PAM again demanded in writing for the immediate return of PAM's data, which Meridian is in unlawful possession of and likewise challenged the fabricated invoices that Meridian and LeBlanc were using as a pretext to justify withholding PAM's Highly Confidential Data.[19]

103.    In response, counsel for Meridian again threatened to destroy PAM's data and refused on behalf of Meridian and LeBlanc to return any such data unless PAM would pay the manufactured and unsubstantiated invoice LeBlanc insisted on.[20]

104.    On June 14, 2019, PAM through its counsel, expressly notified LeBlanc and Meridian that it had no authorization to destroy PAM's data and again demanded in writing the return of PAM's money and misappropriated data.[21]

---

[18] *See id.* at 39:4-40:12.
[19] A true and correct copy of Mrs. Pector's June 10, 2019 email to Ms. Adams is attached as Exhibit "9".
[20] A true and correct copy of Ms. Adams' June 10, 2019 email to Mrs. Pector is attached as Exhibit "10".
[21] A true and correct copy of Mrs. Pector's June 14, 2019 email to Ms. Adams is attached as Exhibit "11".

105.   To no avail, Meridian refused to return all of PAM's data and, on June 21, 2019, sent a letter to PAM noting that it would only consider returning PAM's Q1 data and intended to delete all of PAM's other data[22] to which PAM refused.

## J.     LeBlanc mines PAM's data without authorization and unlawfully facilitates the disclosure of PHI in open court

106.   On June 26, 2019, LeBlanc and Meridian manufactured yet another basis to improperly seek a TRO in Harris County, this time in connection with facts related to a co-defendant in the Texas Lawsuit, Key Management Group, Inc. ("KMG")—not any of the PAM Defendants.   Notwithstanding, in that application, LeBlanc and Meridian incorrectly and maliciously accused PAM of enabling KMG to disclose PHI, which PAM definitively disproved with a supporting affidavit and declaration submitted to the Court at the TRO hearing that day.[23]

107.   The TRO Application was denied by the presiding ancillary judge, the Honorable Judge Robert Schaffer, but a highly disturbing event occurred at this TRO hearing further necessitating the filing of this lawsuit and corresponding application for injunctive relief.

108.   Specifically, during the June 26, 2019, TRO hearing, counsel for LeBlanc and Meridian, Caroline Adams, explicitly confirmed that, while the hearing

---

[22] A true and correct of Ms. Adams' June 21, 2019 letter to PAM is attached as Exhibit "12".

[23] Although the Texas Lawsuit has been ongoing since April 3, 2019 and counsel for Meridian is well aware that the PAM Defendants are represented by counsel, counsel for Meridian waited until approximately 3 hours before the TRO hearing to give Defendants notice and style the application as an *ex parte* request.

was ongoing, LeBlanc was accessing and mining PAM's protected patient data without authorization and texting or emailing PHI to Ms. Adams during the hearing for use in furtherance of his and Meridian's pecuniary interests.

109.   Not only was this outrageous misconduct a direct violation of the BAA, but it openly violated HIPAA.

110.   LeBlanc further caused Adams to disclose in open court certain PHI included in PAM's data, of which LeBlanc and Meridian were in unlawful possession.  The unauthorized disclosure occurred as follows:

MS. ADAMS: And not that I want to go back this this patient data issue but the client is not Calverly Leonam. It is [REDACTED] and she is [REDACTED] and she lives right by this area. They list the doctor. They list her condition, and they list the --

THE COURT: You confirmed that that person actually exists and she lives nearby here?

***

MS. ADAMS: It's confirmed. She is a patient, an absolute patient.

THE COURT: What do you mean you confirmed it? We're sitting in a courtroom, you get on your cell phone and confirm that she is an actual –

MS. ADAMS: No, Mr. LeBlanc accessed the database.

THE COURT: Say that again.

MS. ADAMS: Mr. LeBlanc accessed the –

THE COURT: Don't interrupt her. Sit down, please.

MS. ADAMS: Mr. LeBlanc accessed the database and confirmed that that person is –

THE COURT: That's not evidence to be considered here, Ms. Adams. Come on. You're in a courtroom. You can't just fly off on your computer or your cell phone and confirm something like that.

MS. ADAMS: I understand.

THE COURT: We have to rely on evidence here.[24]

111.   Shortly after the hearing, counsel for Meridian called counsel for PAM during which counsel for PAM relayed PAM's concerns about LeBlanc's unauthorized access of PAM's Highly Confidential Data, his corresponding PHI disclosure and the associated implications under HIPAA. Counsel for PAM again emphasized the critical importance of Meridian immediately returning PAM's Highly Confidential Data.

112.   On June 27, 2019, counsel for Meridian sent another email confirming Meridian's intention to delete rather than return PAM's data despite all of PAM's prior requests to the contrary.[25]

113.   In response, that same day, PAM notified Meridian and LeBlanc through counsel that Meridian and LeBlanc had no authorization to be in possession of PAM's data and again immediately requested the return of all PAM's data on an expedited basis, expressly including patient information.[26]

---

[24] A true and correct copy of the transcript from the June 26, 2019 Hearing in Houston, Texas is attached as Exhibit "13". *See id*. at 40:20-41:1; 42:24-43:18.
[25] A true and correct copy of Ms. Pector's June 27, 2019 email exchange with Ms. Adams is attached as Exhibit "14".
[26] *Id.*

114.   In response, LeBlanc and Meridian once again refused to return PAM's data and renewed its threat to immediately destroy PAM's Highly Confidential Data, leaving PAM with no choice but to seek judicial intervention and injunctive relief.[27]

# COUNT 1
## VIOLATIONS OF DEFEND TRADE SECRETS ACT
18 U.S.C. § 1836 *et seq.*
**(AGAINST LEBLANC AND MERIDIAN)**

115.   PAM incorporates each of the facts and allegations detailed above as though fully set forth herein.

116.    PAM input Highly Confidential Data, including confidential customer and vendor contact information, lists and preference information into Meridian's Q1 application so PAM could use the application for its daily operations.

117.   PAM's information constitutes highly confidential information that PAM does not share with the public and takes extensive measures to protect including requiring individuals who access this information to undertake corresponding confidentiality obligations.   Additionally, access to the highly sensitive data is protected by a password login.

118.   Meridian in turn agreed to safeguard the confidentiality of this Highly Confidential Data and return it to PAM upon request.

---

[27] *Id.*

119.   This information includes, but is not limited to, confidential customer and vendor information that PAM entered directly into Meridian's "Q1" contact tracking system.

120.   Because PAM entered this data directly into the "Q1" system, PAM does not have a copy of it.  Instead, the sole copy resides on Meridian's servers.

121.   This information is critical to PAM's operations as it directly pertains to PAM's service of its customers and use of vendors to facilitate PAM's daily operations and would be extremely valuable to a competitor of PAM or an entity like Meridian who is searching to find new customers to replace the business PAM historically provided to Meridian.

122.   When Meridian and LeBlanc unlawfully terminated PAM's access to its applications and willfully deprived PAM of access to its Highly Confidential Data contained within the "Q1" application.

123.   Beginning on May 8, 2019, PAM demanded, among other things, that Meridian and LeBlanc immediately return PAM's data and confidential information in the Q1 application.  In response, LeBlanc and Meridian refused to return PAM's Highly Confidential Data and instead misappropriated it.

124.   LeBlanc and Meridian subsequently threatened to destroy such data despite being aware that PAM does not have a copy of all such data and needs its Highly Confidential Data for its operations.

125.   After staunch objection by PAM to Meridian's misappropriation and inappropriate threats to destroy PAM's data, Meridian resorted to extortion and again threatened to destroy PAM's data if it did not pay an $8,500 manufactured fee to return PAM's Q1 data.

126.   PAM's confidential customer and vendor information qualifies for trade secret protection under the Defend Trade Secret Act, **1**8 U.S.C. § 1836 *et seq.* ("DTSA"):  this information derives independent economic value and gives PAM an advantage over its competitors because such information is not generally known to PAM's competitors or to others in the industry, and because it is not easily acquired through proper means by PAM's competitors or by others in the industry.[28]

127.   Elizabeth Market, a minority owner of Meridian, acknowledged that this type of information constitutes a trade secret.

128.   PAM has invested substantial time and money in developing its confidential customer and vendor information, and PAM has taken and continues to take reasonable measures to protect and preserve the secrecy of its confidential customer and vendor information.[29]

129.   Access to this information is given to PAM's employees only to the extent required by their positions and only upon their acknowledgment of PAM's

---

[28] A true and correct copy of the Affidavit of Lisa L. MacLean is attached hereto as Exhibit "15".  *Id.* at ¶¶ 5-6.
[29] *Id.* at ¶ 5.

policies and code of conduct or execution of agreements similar to the one at issue in this case.[30]

130.   In this case, PAM's confidential customer and vendor information were input into the Meridian Q1 application for the sole and exclusive purpose of receiving services from Meridian under strict confidentiality obligations.

131.   LeBlanc and Meridian's deliberate and willful refusal to return PAM's highly confidential customer and vendor information and its use of it to attempt to blackmail PAM constitutes willful and malicious misappropriation and use, which subjects PAM to imminent and irreparable harm due to the lack of access to data necessary to its daily operations for which injunctive relief is necessary.

132.   PAM has already suffered and, reasonably anticipates that it will continue to suffer significant damages as a direct and proximate result of the intentional misappropriation of its confidential customer and vendor information by Meridian and LeBlanc and threatened continued misappropriation.

133.   As a result, PAM is entitled to damages, attorneys' fees, cost, and expenses under the DTSA in connection with Meridian's misappropriation and anticipated further violations as set forth above.

---

[30] *See Id.* at ¶¶ 6-7.

## COUNT 2
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
18 U.S.C. § 1030, *et seq.*
## (AGAINST LEBLANC AND MERIDIAN)

134.   PAM incorporates each of the facts and allegations detailed above as though fully set forth herein.

135.   The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, provides in pertinent part that "whoever knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer shall be punished as provided in . . . this section." 18 U.S.C. § 1030(a)(5).

136.   The term "protected computer" means a computer "which is used in or affecting interstate of foreign commerce or communication."   18 U.S.C. § 1030(e)(2)(B).   The term "damage" means "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

137.   The CFAA specifically provides that an aggrieved party may institute a private right of action under certain circumstances.

138.   The CFAA provides, in pertinent part, that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.

139.   Section 1030(a)(2)(C) of the CFAA prohibits intentionally accessing a protected computer, without authorization or by exceeding authorized access, and obtaining information from a protected computer.

140.   Moreover, under Section 1030(c)(4)(A)(i), jurisdiction over a civil action brought under the Computer Fraud and Abuse Act is established when, among other things, there is a loss to one or more persons during any one-year period aggregating at least $5,000 in value.

141.   Here, Meridian's database of PAM's information was constructed specifically for PAM's benefit, to host only PAM's business information, and Meridian's authorization to access the information on the database was limited to the authorization specifically granted by PAM, as directed by PAM.

142.   Thus, Meridian was given authorization to access a computer database that effective belongs to PAM.

143.   Upon non-renewal of the BAA, PAM withdrew its authorization to Meridian to access its computerized information on the database.

144.   LeBlanc individually and on behalf of Meridian intentionally accessed PAM's protected computerized information, without authorization and by exceeding authorized access and, in doing so, obtained information PHI from PAM's Highly Confidential Data on the protected computer.  A play-by-play of LeBlanc's actions was provided by his attorney on the record in open court.

145.   In taking these actions, LeBlanc and Meridian caused PAM to experience a loss greater than $5,000 in value, as PAM has conducted an extensive assessment of potential violations under HIPAA and taken action to regain access to its data located on the protected computer.

146.   Furthermore, PAM has reasonable concerns that Meridian's third party contractors and employees may still be in possession of or able to access PAM's protected information.

147.   As a result of the foregoing, injunctive relief is necessary to prevent further violations by LeBlanc and Meridian of the CFAA and to protect and restore PAM's Highly Confidential Data to PAM.

148.   PAM is further entitled to consequential damages as a result of LeBlanc's and Meridian's actions.   However, injunctive relief is necessary as monetary damages will not make PAM whole for Meridian's misconduct.

## COUNT 3
## BREACH OF CONTRACT
### (AGAINST MERIDIAN)

149.   PAM incorporates each of the facts and allegations detailed above as though fully set forth herein.

150.   The BAA executed by LeBlanc on behalf of Meridian was a valid, binding, and enforceable contract between PAM and Meridian that required Meridian to safeguard PAM's patient data and ensure it was not accessed, used or

disclosed for an unauthorized purpose and was maintained as confidential. These obligations remain ongoing even after the termination of the BAA.

151. In reliance on Meridian's promise to comply with its contractual obligations, PAM imported Highly Confidential Data into Meridian's applications for the purpose of supporting PAM's operations.

152. PAM complied with and performed its contractual obligations under the BAA.

153. As evidenced above, however, LeBlanc, acting on behalf and for the benefit of Meridian, engaged in conduct that materially breached the BAA.

154. In particular, at least on June 26, 2019, LeBlanc accessed and used PHI included in PAM's protected patient data in furtherance of Meridian's own pecuniary interests.

155. At the time when this breach occurred, Meridian was no longer providing services to PAM and did not have PAM's authorization to be in possession of PAM's patient data or other Highly Confidential Data.

156. These actions taken by LeBlanc on behalf of Meridian were not permitted or otherwise contemplated by the BAA but, rather, were expressly limited to using PHI solely to perform services for PAM.

157. Meridian was obliged under its implied duty of good faith and fair dealing to refrain from doing anything that would destroy or injure the right of PAM

to receive the benefits of the contract during the life of the contract or in the aftermath of its termination.

158.   Meridian's conduct during the contract and in the course of the PAM's lawful non-renewal is without honesty, in violation of the letter and the spirit of its contractual obligations, and an abuse of its power.

159.   Meridian's actions described herein violate the letter of the BAA and its duty of good faith and fair dealing under the BAA.

160.   All conditions precedent to PAM bringing this breach of contract claim have been either fully satisfied or expressly or impliedly waived by Meridian

161.   As acknowledged by Meridian pursuant to the BAA, Meridian's breach and threatened breach of the BAA have caused and will continue to cause PAM to suffer irreparable harm which is inadequately compensable by monetary damages.

162.   PAM has suffered and/or will suffer damages as the direct and proximate consequence of Meridian's breaches of their covenants contained in the BAA.

163.   PAM is entitled to recover compensatory and consequential damages as a result of Meridian's breaches of the BAA, as well as attorneys fees, costs of suit, and injunctive relief to prevent Meridian and any of its agents, including LeBlanc, from engaging in further misconduct.

164.   Additionally, because money damages are insufficient to make whole and protect PAM, PAM is entitled to and seeks specific performance of the BAA.

165.   Meridian is liable to PAM for, and PAM specifically seeks its reasonable and necessary attorneys' fees incurred for the preparation and trial of this claim, plus additional sums in the event of an appeal.

## V.
## REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

166.   Unless immediately restrained, LeBlanc and Meridian will cause further irreparable harm to PAM for which there is no adequate remedy at law, including, without limitation, access and use of PAM's Highly Confidential Data creating further potential HIPAA and other legal exposure, interference with patient treatment, competitive harm, potential destruction of PAM's Highly Confidential Data and/or loss of goodwill and/or business reputation.

167.   As a result, PAM seeks a temporary restraining order until the date set for a preliminary injunction hearing and, after notice and a hearing, a preliminary injunction preventing LeBlanc and Meridian from retaining, using, disclosing, destroying or accessing PAM's Highly Confidential Data.

168.   A temporary restraining order and preliminary injunction are necessary to preserve PAM's rights pending trial on the merits and are contemplated by the plain language and requirements of section XI of the BAA.

169.   There is a substantial likelihood that PAM will prevail on the merits. LeBlanc and Meridian directly breached the BAA, misappropriated trade secret information and violated HIPAA and the CFAA.

170.   Further, if Meridian and LeBlanc or their employees, contractors or representatives are allowed to misappropriate and/or misuse PAM's Highly Confidential Data or otherwise gain an unfair advantage over PAM, such actions would subject PAM to irreparable harm.

171.   The threatened injury to PAM outweighs any possible damage to LeBlanc or Meridian because an injunction would simply require them to live up to their obligations under the BAA and return and refraining from accessing, using, disclosing or retaining PAM's Highly Confidential Data or otherwise violating the law by disclosing PHI or misusing PAM's trade secrets for their own pecuniary gain.

172.   The public interest, including ensuring uninterrupted patient treatment and fair competition, is served by an injunction as it protects PAM's Highly Confidential Data, business and goodwill.

173.   The BAA (and Meridian and LeBlanc's torts) warrants the issuance of a temporary restraining order and preliminary injunction restraining LeBlanc and Meridian as well as their officers, agents, employees, contractors, representatives, related entities and those in active concert or participation with them, during the pendency of this case, from:

a. Retaining, copying, using, mining, disclosing, accessing or distributing any of PAM's Highly Confidential Data for any reason;

b. Destroying or deleting any of PAM's Highly Confidential Data before all such information is returned to PAM and receipt is confirmed;

c. Deleting, altering, destroying, or removing, other than PAM's Highly Confidential Data after its been returned, any emails, documents, data, information, electronic postings, social media, text messages, voicemails, records, files, history data or properties, relating in any way to the facts and/or claims asserted in PAM's Verified Complaint or the prior business relationship between PAM, Meridian and/or LeBlanc, that are contained or stored in connection with or on any of LeBlanc or Meridian's computers, servers, electronic devices, data storage devices, external devices, computer hardware, blackberries, iPhones, iPads, cell phones, PDAs, tablets, software, zip drives, hard drives, thumb drives, USB devices, .pst files, circuit boards, memory chips, tapes, floppy discs, CDs, and other electronic equipment, work or personal email accounts, social media accounts, storage devices, or data that is otherwise accessible through computer, cloud or similar storage areas, or other information storage or retrieval systems, work accounts and/or any other personal, business email or social networking accounts. All of LeBlanc and any of Meridian's employees, officers, owners, contractors or representatives' computers, electronic devices, data storage devices, external devices, computer hardware, PDAs, software, phones, zip drives, hard drives, thumb drives, circuit boards, memory chips, tapes, floppy discs, CDs, email account, text message, instant messages, social media accounts, and other electronic equipment or storage devices, data that is otherwise accessible through computer and/or other information storage or retrieval systems, which contain any of PAM's Highly Confidential Data, must immediately be turned over to an agreed forensic examiner for review, forensic analysis and extraction; and

d. Within three days of the entry of this Temporary Restraining Order, Defendants are further ordered to forensically verify in writing under oath that neither LeBlanc, Meridian nor any of their current or former employees, officers, contractors, owners, agents, representatives or related entities are in retention, possession, custody or control of any copies of PAM's Highly Confidential Data, that all such data has been

returned to PAM  and all such individuals and entities have not disclosed any of PAM's Highly Confidential Data to any third party at any time other than returning such data as set forth above or for the purpose of providing services to PAM.

## VI.
## BOND

174.   PAM maintains a bond is not necessary given that Defendants are unlawfully in possession of PAM's Highly Confidential Data.

175.   If, however, the Court determines a bond is appropriate, it should be set at a minimal amount.

176.   PAM seeks only to maintain the status quo by enforcing LeBlanc and Meridian's ongoing contractual obligations to PAM and preventing them from further retaining, using, disclosing, mining, accessing, copying or distributing any of PAM's Highly Confidential Data of which Meridian and LeBlanc are not authorized to be in possession.

177.   Therefore, the status quo will not harm any of the Defendants.

## VII.
## CONDITIONS PRECEDENT

178.   All conditions precedent to PAM's claim for relief have been performed or have occurred, or were otherwise met, waived, or excused.

## VIII.
## JURY DEMAND

179.   PAM hereby requests a trial by jury on its claims against LeBlanc and Meridian.

## IX.
## REQUESTED RELIEF

Based on the foregoing, Post Acute Medical, LLC respectfully requests the following relief:

1.      Issue a temporary restraining order enjoining Chris LeBlanc, Meridian Hospital Systems Corporation and their employees, representatives, agents, officers, owners, contractors or anyone acting in concert with them (collectively "Meridian") from the conduct set forth above;

2.      Enjoin Meridian and LeBlanc, preliminarily until hearing, and thereafter permanently, from breaching the obligations in the BAA;

3.      Enjoin LeBlanc and Meridian, and any person working in concert with them, preliminarily until hearing, and thereafter permanently, from accessing, using, or threatening to destroy any data belonging to PAM;

4.      Judgment be awarded in favor of PAM and against Defendants on all counts;

5.      PAM be awarded actual, compensatory, and punitive damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, including,

but not limited to, all costs of the investigation into LeBlanc and Meridian's unlawful actions; and exemplary damages; and

6.      PAM be awarded such other and further necessary and proper relief as the Court may deem just and appropriate.

Respectfully submitted,


*/s/ Bridget E. Montgomery*

Bridget E. Montgomery, Esquire (PA ID 56105)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
213 Market Street, 8th Floor
Harrisburg, PA  17101
Telephone:  717.237.6054
Facsimile:   717.237.6019
Email:        bmontgomery@eckertseamans.com


Date:  July 2, 2019        *Attorneys for Post Acute Medical, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| POST ACUTE MEDICAL, LLC, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | |
| | § | Civil Action No. _____ |
| CHRISTOPHER LEBLANC AND | § | |
| MERIDIAN HOSPITAL SYSTEMS | § | JURY TRIAL DEMANDED |
| CORPORATION | § | |
| | § | |
| DEFENDANTS. | § | |
| | § | |
| | § | |
| | § | |

## DECLARATION OF ROBERT J. TRIBECK

1.    I, Robert J. Tribeck, declare the following in accordance with the requirements of 28 U.S.C. § 1746.

2.    I am employed by Post Acute Medical, LLC as its Executive Vice President and Chief Legal Officer.  In that capacity, I am authorized to make this verification on its behalf.

3.    I have read *Post Acute Medical, LLC's Verified Complaint, Application for Temporary Restraining Order, and Request for Preliminary Injunction* (the "Complaint").

4.    The factual statements contained in the Complaint are true and correct to the best of my knowledge, information, and belief.

**Executed on July 2,  2019.**

_____
Robert J. Tribeck